Opinion by Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge REINHARDT; Concurrence by Judge IKUTA.
KOZINSKI, Circuit Judge.
We consider the scope of immunity accorded to an online roommate matching service by the Communications Decency Act (“CDA”), 47 U.S.C. § 230(c).
Facts
The Internet has opened new channels of communication and self-expression. See Lev Grossman, Time’s Person of the Year: You, Time Mag., Dec. 13, 2006-Jan. 1, 2007, at 38, 40-41. Countless individuals use message boards, date matching sites, interactive social networks, blog hosting services and video sharing websites to make themselves and their ideas visible to the world.[1] While such intermediaries enable the user-driven digital age, they also create new legal problems.
This case involves one such intermediary, Roommate.com, LLC (“Roommate”), which operates an online roommate matching website at www.roommates.com. This website helps individuals find roommates based on their descriptions of themselves and their roommate preferences. Roommates.com has approximately 150,000 active listings and receives about a million page views per day.
To become members of Roommate, users respond to a series of online questionnaires by choosing from answers in drop-down and select-a-box menus. Users must disclose information about themselves and their roommate preferences based on such characteristics as age, sex and whether children will live in the household. They can then provide “Additional Comments” through an open-ended essay prompt.
Roommate’s free membership allows users to create personal profiles, search lists of compatible roommates and send “roommail” messages to other members. Roommate also sends email newsletters to members seeking housing, listing compatible members who have places to rent out. Roommate’s fee-based membership allows users to read their “roommail” and view the “Additional Comments” essays of other members.
The Fair Housing Councils of San Fernando Valley and San Diego (“the Councils”) filed suit in federal district court, claiming that Roommate violated the Fair Housing Act (“FHA”) and various state laws. The district court held that the Communications Decency Act barred the Councils’ FHA claim. As a result, the court granted, in part, Roommate’s summary judgment motion and entered judgment in Roommate’s favor on the FHA claim. The district court then declined to *925 exercise supplemental jurisdiction over the state-law claims and dismissed them. It also denied Roommate’s motion for attorneys’ fees and costs. The Councils now appeal the dismissal of their FHA claim and Roommate cross-appeals the denial of fees and costs.
Analysis
According to the CDA, “[n]o provider ... of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.” 47 U.S.C. § 230(c). One of Congress’s goals in adopting this provision was to encourage “the unfettered and unregulated development of free speech on the Internet.” Batzel v. Smith, 333 F.3d 1018, 1027 (9th Cir.2003) (citing 47 U.S.C. § 230(a)(3)-(4), (b)(l)-(2)).[2]
The touchstone of section 230(c) is that providers of interactive computer services are immune from liability for content created by third parties.[3] The immunity applies to a defendant who is the “provider ... of an interactive computer service” and is being sued “as the publisher or speaker of any information provided by” someone else. 47 U.S.C. § 230(c). “[Reviewing courts have treated § 230(c) immunity as quite robust.” Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir.2003).
The Councils do not dispute that Roommate is a provider of an interactive computer service.[4] As such, Roommate is immune so long as it merely publishes information provided by its members. Batzel, 333 F.3d at 1031. However, Roommate is not immune for publishing materials as to which it is an “information content provider.” A content provider is “any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet.” 47 U.S.C. § 230(f)(3) (emphasis added). In other words, if Roommate passively publishes information provided by others, the CDA protects it from liability that would otherwise attach under state or federal law as a result of such publication.[5] But if it is responsible, in whole or in part, for creating or developing the information, it becomes a content provider and is hot entitled to CDA immunity. As we explained in Carafano, “an ‘interactive computer service’ qualifies for immunity so long as it does not also function as an ‘information content provider’ for the portion of the statement or publication at issue.” 339 F.3d at 1123.
*926 The Councils claim Roommate violates the FHA in three ways: (1) it posts the questionnaires on its website and requires individuals who want to take advantage of its services to complete them; (2) it posts and distributes by email its members’ profiles; and (3) it posts the information its members provide on the “Additional Comments” form. For all three categories, the question is whether Roommate is “responsible, in whole or in part, for the creation or development of [the] information.” 47 U.S.C. § 230(c), (f)(3); see also Batzel, 333 F.3d at 1031.
1. As previously explained, in order to become members of Roommate and take advantage of the services it offers, individuals must complete a series of questionnaires. Individuals looking for a room must first complete a form about themselves. They must use a drop-down menu to identify themselves as either “Male” or “Female” and to disclose whether “Children will be present” or “Children will not be present.” Individuals looking to rent out a room must complete a similar form. They must use a check-box menu to indicate whether “Straight male(s),” “Gay male(s),” “Straight female(s),” and/or “Lesbian(s)” now live in the household, and a drop-down menu to disclose if there are “Children present” or “Children not present.” If users fail to provide answers to any of these questions, they cannot complete the membership registration process.
In addition to completing one of the two forms described above, all prospective members must fill out the “My Roommate Preferences” form. They must use a drop-down menu to indicate whether they are willing to live with “Straight or gay” males, only “Straight” males, only “Gay” males, or “No males,” or may choose to select a blank response. Users must make comparable selections for females. They must also declare “I will live with children,” “I will not live with children” or change the field to a blank.[6]
As we previously explained, an entity cannot qualify for CDA immunity when it is “responsible, in whole or in part, for the creation or development of [the] information” at issue. 47 U.S.C. § 230(c), (f)(3); see also Batzel, 333 F.3d at 1031. Roommate is “responsible” for these questionnaires because it “creat[ed] or developed]” the forms and answer choices. As a result, Roommate is a content provider of these questionnaires and does not qualify for CDA immunity for their publication.
Roommate objects that simply asking questions cannot violate the FHA. Yet the Councils advance two theories under which publication of these forms arguably does violate the FHA. First, the Councils argue that asking users to provide information about themselves and their roommate preferences is a “statement ... with respect to the sale or rental of a dwelling *927 that indicates ... an intention to make [a] preference, limitation or discrimination.” See 42 U.S.C. § 8604(c) (emphasis added); see, e.g:, Jancik v. Dep’t of Hous. & Urban Dev., 44 F.3d 553, 557 (7th Cir.1995); Soules v. Dep’t of Hous. & Urban Dev., 967 F.2d 817, 824 (2d Cir.1992).[7] Second, the Councils claim that requiring members to answer questions that enable other members to discriminate for or against them violates the FHA by “caus[ing] ” users “to [make] ... any ... statement ... with respect to the. sale or rental of a dwelling that indicates any preference, limitation, or discrimination.” 42 U.S.C. § 3604(c) (emphasis added).
At this stage, we are only concerned with whether Roommate is immune from liability under the CDA, not whether it actually violated the FHA. We describe the Councils’ FHA theories only to show that the mere asking of questions might, indeed, violate the FHA. It will be up to the district court on remand to decide initially whether Roommate violated the FHA by publishing its form questionnaires.[8]
2. We now turn to the more difficult question of whether the CDA exempts Roommate from liability for publishing and distributing its members’ profiles, which it generates from their answers to the form questionnaires.
Roommate strongly urges that Carafano settles the issue. In Carafano, an unidentified prankster placed a fraudulent personal ad on a date matching website. 339 F.3d at 1121. This imposter created a profile for Carafano, an actress, listing her real phone number and address. The ad claimed that Carafano was looking for “a one-night stand” with a controlling man. Id. We held that the CDA exempted the service from liability for two reasons.
First, the dating service was not an “information content provider” for the profiles' on its website. Although the website required users to complete detailed questionnaires consisting of both multiple choice and essay questions that provided “structure and content” and a “menu of ‘pre-prepared ' responses,’ ” these forms merely “facilitated the expression of information by individual users.” Id. at 1124-25 (internal quotation marks omitted). We concluded that the service could not “be considered an ‘information content provider’ under the [CDA] because no profile ha[d] any content until a user actively create[d] it.” Id. at 1124. Second, even if the dating service could be considered a content provider for publishing its customers’ profiles, it was exempt from liability *928 because it did not “create[] or develop[] the particular information at issue.” Id. at 1125. The anonymous user entered Cara-fano’s phone number, address and fabricated sexual proclivities, and his entries were “transmitted unaltered to profile viewers.” Id. The service was not a content provider of the offending information because it “did not play a significant role in creating, developing or ‘transforming’ ” it. Id.
Carafano differs from our case in at least one significant respect: The prankster in Carafano provided information that was not solicited by the operator of the website. The website sought information about the individual posting the information, not about unwitting third parties. Nothing in the questions the dating service asked suggested, encouraged or solicited posting the profile of another person, and the website’s policies prohibited altogether the posting of last names and contact information. Id. at 1121. While Carafano is written in broad terms, it must be read in light of its facts. Carafano provided CDA immunity for information posted by a third party that was not, in any sense, created or developed by the website operator — indeed, that was provided despite the website’s rules and policies. Id. We are not convinced that Carafano would control in a situation where defamatory, private or otherwise tortious or unlawful information was provided by users in direct response to questions and prompts from the operator of the website.
Imagine, for example, www. harrassthem.com with the slogan “Don’t Get Mad, Get Even.” A visitor to this website would be encouraged to provide private, sensitive and/or defamatory information about others — all to be posted online for a fee. To post the information, the individual would be invited to answer questions about the target’s name, addresses, phone numbers, social security number, credit cards, bank accounts, mother’s maiden name, sexual orientation, drinking habits and the like. In addition, the website would encourage the poster to provide dirt on the victim, with instructions that the information need not be confirmed, but could be based on rumor, conjecture or fabrication.
It is not clear to us that the operator of this hypothetical website would be protected by the logic of Carafano. The date match website in Carafano had no involvement in the creation and development of the defamatory and private information; the hypothetical operator of harrassth-em.com would. By providing a forum designed to publish sensitive and defamatory information, and suggesting the type of information that might be disclosed to best harass and endanger the targets, this website operator might well be held responsible for creating and developing the tortious information. Carafano did not consider whether the CDA protected such websites, and we do not read that opinion as granting CDA immunity to those who actively encourage, solicit and profit from the tortious and unlawful communications of others.
While mapping the outer limits of Cara-fano’s protection of websites that solicit and post users’ responses is an interesting and difficult task, we need not undertake it today because Roommate does more than merely publish information it solicits from its members. Roommate also channels the information based on members’ answers to various questions, as well as the answers of other members. Thus, Roommate allows members to search only the profiles of members with compatible preferences. For example, a female room-seeker who is living with a child can only search profiles of room-providers who have indicated they are willing to live with women and children. Roommate also sends room-seekers *929 email notifications that exclude listings incompatible with their profiles. Thus, Roommate will not notify our female about room-providers who say they will not live with women or children.
While Roommate provides a useful service, its search mechanism and email notifications mean that it is neither a passive pass-through of information provided by others nor merely a facilitator of expression by individuals. By categorizing, channeling and hmiting the distribution of users’ profiles, Roommate provides an additional layer of information that it is “responsible” at least “in part” for creating or developing. 47 U.S.C. § 230(c), (f)(3); see also Batzel, 333 F.3d at 1031. Whether these actions ultimately violate the FHA is a question the district court must decide in the first instance.[9]
3. Finally, we consider whether the CDA exempts Roommate from liability for publishing the content its members provide in the “Additional Comments” portion of their profiles. Members provide this information by filling in a blank text box. Next to this box, Roommate advises users that “[w]e strongly recommend taking a moment to personalize your profile by writing a paragraph or two describing yourself and what you are looking for in a roommate.” The responses to this query produce the most provocative and revealing information in many users’ profiles. Some state that they “Pref[er] white Male roommates,” while others declare that they are “NOT looking for black muslims.” Some don’t want to deal with annoyances such as “drugs, kids or animals” or “smokers, kids or-druggies,” while others want to stay away from “psychos or anyone on mental medication.” More friendly folks are just looking for someone who will get along with their significant other[10] or their most significant Other.[11]
We conclude that Roommate’s involvement is insufficient to make it a content provider of these comments. Roommate’s open-ended question suggests no particular information that is to be provided by members; Roommate certainly does not prompt, encourage or solicit any of the inflammatory information provided by some of its members. Nor does Roommate use the information in the “Additional Comments” section to limit or channel access to listings. Roommate, is therefore not ‘‘‘responsible, in whole or in part, for the creation or development of’ its users’ answers to the open-ended “Additional Comments” form, and is immune from liability for publishing these responses. 47 U.S.C. § 230(c), (f)(3); see also Batzel, 333 F.3d at 1031.
Having determined that the CDA does not immunize Roommate for all of the content on its website and in its email newsletters, we remand for a determination of whether its non-immune publication and distribution of information violates the *930 FHA, 42 U.S.C. § 3604(c). We also vacate the dismissal of the state law claims so that the district court may reconsider whether to exercise its supplemental jurisdiction in light of our ruling on the federal claims. Fredenburg v. Contra Costa County Dep’t of Health Servs., 172 F.3d 1176, 1183 (9th Cir.1999). We deny Roommate’s cross-appeal for attorneys’ fees and costs; as the Councils prevail on some of their arguments here, their case is perforce not frivolous.
REVERSED in part and REMANDED.

. Confirming perhaps Andy Warhol's prediction that everyone would eventually enjoy a trillion or so nanoseconds of fame.

. Congress also wanted to allow interactive computer services to regulate their own content without subjecting themselves to liability. Batzel, 333 F.3d at 1028 (citing 47 U.S.C. § 230(b)(4)); see also n. 5 infra.

. The CDA also provides immunity in such circumstances for users of interactive services, but because our case does not involve a claim against users, we have no occasion to consider the scope of this immunity. We therefore omit all references to user immunity when quoting the statutory text.

. The CDA defines “interactive computer service” as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server.” 47 U.S.C. § 230(f)(2); see also Carafano v. Metrosplash.com, Inc., 207 F.Supp.2d 1055, 1065-66 (C.D.Cal.2002) (date matching website is an "interactive computer service”), aff'd, 339 F.3d 1119 (9th Cir.2003).

.As we discuss below, a provider of an interactive computer service does not lose its CDA .immunity if it merely exercises some control over the posting of information provided by others, such as enforcement of rules as to appropriate content or minor editing. See n. 6 infra. Nor does it generally lose its immunity if it simply facilitates expression of information by individuals. See pp. 927-29 infra.

. When users select the option “I will not live with children,” Roommate publishes this response as "no children please.” The Councils argue that this alteration makes Roommate a content provider and therefore not immune under the CDA for publishing this statement. However, minor editing that does not affect meaning is protected under the CDA as the “usual prerogative of publishers.” See Batzel, 333 F.3d at 1031 (publisher of a newsletter protected under the CDA for making minor editing changes to user-submitted content). Because "no children please” is materially the same as "I will not live with children,” Roommate does not lose its CDA immunity because of the change in wording. On the other hand, the Councils allege that Roommate takes members' blank selection in the children field and publishes it as "no children please.” We could not find support for this proposition in the record, but if Councils’ allegation is true, then Roommate significantly alters the meaning of the information provided by its members and is not entitled to CDA immunity for posting the resulting con- . tent.

. Although amici Amazon.com, Inc., America Online, Inc.,- Ebay Inc., Google Inc., Tribune Company, Yahoo! Inc., Netchoice and United States Internet Service Provider Association support Roommate in this appeal, they acknowledge that "if there were a circumstance in which the content of questions posed by an online intermediary — in isolation, and entirely independent of any user’s answers or any third-party’s use of the questions or users' answers — was itself unlawful, then section 230 might not protect the intermediary from a cause of action based solely on the questions.”

. Roommate also argues that we should not consider the Councils’ FHA liability theories based on the questionnaires because these arguments were not properly raised below. However, we are reviewing only the district court’s grant of summary judgment on CDA grounds and remanding the FHA claim for resolution by the district court. In any event, the Councils, in their First Amended Complaint, cited to the FHA, 42 U.S.C. § 3604(c), and alleged that Roommate "encourages” users to state discriminatory preferences. This is more than enough under our liberal notice pleading rule. See Johnson v. Barker, 799 F.2d 1396, 1401 (9th Cir.1986) ("Under federal notice pleading, appellants are allowed to vary their theory to conform to proof presented.”).

.Roommate does not ask questions about race, nor does it categorize or channel the information based on racial preferences. Yet, the logic of its position — that it is protected by the CDA for its activities because they are based on answers from its members — would protect it (or one of its competitors), if it did. Thus, if a hypothetical website required members to identify themselves by race, under Roommate's logic, the CDA would protect this site if it prevented members who listed themselves as “African-American” or "Asian” from viewing any "Whites Only ".listings. We doubt this is what Congress had in mind when it passed the CDA.

. “The female we are looking for hopefully wont [sic] mind having a little sexual incoun-ter [sic] with my boyfriend and I [very sic].”

. "We are 3 Christian females who Love our Lord Jesus Christ.... We have weekly bible studies and bi-weekly times of fellowship.”